IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ALICE ANNETTE DEVENTURE,**            Case 5:15 CV 872

     Plaintiff,                                             Judge John R. Adams

     v.                                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                              REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Alice Deventure ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated May 4, 2015). For the reasons stated below, the undersigned recommends affirming the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on April 2, 2012, alleging an onset date of February 15, 2011. (Tr. 169-82). Plaintiff applied for benefits due to arthritis, depression, difficulty breathing, back problems, and anxiety. (Tr. 71). Her claims were denied initially and upon reconsideration. (Tr. 71-92, 95-115). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 141). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on December 3, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 10-70). The Appeals Council denied Plaintiff's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on May 4, 2015. (Doc. 1).

**FACTUAL BACKGROUND**

*Personal Background and Testimony*

Born February 15, 1961, Plaintiff was 52 years old as of the hearing date. (Tr. 36). She had completed the tenth grade. (Tr. 46). She had past work as a punch press operator and cashier. (Tr. 48-50). She lived in an apartment with her three grandchildren, ages eight, six, and three; and she received assistance caring for the children from her mother and the children's father. (Tr. 38). Plaintiff stated she and her mother got the children off to school in the morning and their father helped out after school and on weekends. (Tr. 38-42).

Plaintiff stated she had been on oxygen full-time since September 2013, and complained that without it, she became lightheaded. (Tr. 41). She also complained of dizziness in the morning and three to four headaches a week. (Tr. 57). She also admitted that she is still smoking. (Tr. 41). Plaintiff estimated she could only walk 30-40 feet before she became winded and related that exertion worsened her symptoms. (Tr. 54-55). She reported that she rarely went grocery shopping or did the laundry because she lacked the energy. (Tr. 44, 46). Plaintiff testified she took three to four half-hour naps a day. (Tr. 55).

As of May 2012, Plaintiff reported performing daily childcare, cooking, doing chores, caring for her personal hygiene, going shopping, and managing her finances; although she noted she was easily winded and could only walk 20-30 feet. (Tr. 228-34). This was similar to Plaintiff's reports of her abilities in July 2012. (Tr. 74). However, by August 2012, Plaintiff's abilities had drastically declined and she reported an inability to do housework or go shopping, and stated she relied on her family for all of her day-to-day needs. (Tr. 247, 250).

*Relevant Medical Evidence*

In February 2011, Plaintiff went to the emergency room twice with complaints of chest congestion. (Tr. 270, 272). She reported she was diagnosed with bronchitis in January by her family doctor but was not getting any better. (Tr. 270, 272). On examination, she had clear, equal breath sounds and symmetric chest expansion, but some wheezing. (Tr. 270-72). Her chest x-rays were largely normal. (Tr. 270-72, 290-92). About a week later, Plaintiff returned to the hospital complaining of abdominal pain; at that time, she reported no shortness of breath or difficulty breathing. (Tr. 317).

On March 17, 2011, Plaintiff was seen at the emergency room for complaints of persistent shortness of breath and cough. (Tr. 267). At this time, it was reported Plaintiff smoked between a half a pack and a pack and half of cigarettes per day for more than 20 years. (Tr. 267, 307). On physical examination, she had an occasional moist cough, coarse scattered rhonchi, no wheezing, no rales, and no prolongation of expiratory sounds. (Tr. 267). A chest x-ray showed no acute disease and resolved lower lobe pneumonia (Tr. 282-84); however, she was administered IV and oral antibiotics, albuterol aerosols, and admitted for further observation. (Tr. 268). A March 24, 2011, pulmonary function test ("PFT") revealed forced expiratory volume in the first second ("FEV1") of 1.31 liters which indicated a "moderately severe obstructive ventilator defect." (Tr. 303). Follow-up x-rays and examinations over the next few days, showed improvement and were largely normal. (Tr. 285-87, 289, 304-09). Plaintiff was discharged on March 29, 2011. (Tr. 313).

In April and May 2011, Plaintiff reported shortness of breath and fatigue to Eric Waddington, M.D., her primary care physician, who started her on steroids and antibiotics to combat a possible pneumonia. (Tr. 534-36). Plaintiff returned about a week later and Dr.

Waddington discontinued the steroids and opted for Advair to assist with her breathing. (Tr. 533). He believed her difficulties breathing were more likely linked to chronic obstructive pulmonary disease ("COPD"). (Tr. 533). On August 26, 2011, Plaintiff complained to Dr. Waddington of shortness of breath with exertion, wheezing, and pain with breathing that were not helped by either albuterol or Advair inhalers. (Tr. 532). Plaintiff also underwent a PFT on September 6, 2011, that revealed she was unable to sustain high levels of ventilation but her lung volume was normal. (Tr. 301-02). The impression was "reversible bronchospastic component, [with] decreased maximum voluntary ventilation". (Tr. 367). X-Rays in May and September 2011, were largely normal except for some pleural fluid and atelectatic changes (Tr. 277, 281).

Plaintiff visited the hospital in late September 2011, where she reported pain upon coughing. (Tr. 327). She was diagnosed with bronchitis, administered steroids and antibiotics, and discharged home. (Tr. 328-29). Plaintiff returned to the emergency room in mid-October 2011, with complaints of continued cough. (Tr. 323). On examination, she had no respiratory distress but an occasional bilateral wheeze; she was discharged after aerosol therapy. (Tr. 323-25). A CT revealed COPD but not pneumonia. (Tr. 325). An October 2011, chest x-ray showed only mild emphysema. (Tr. 276).

Dr. Waddington remarked in October 2011 that Plaintiff's most recent PFT showed "marked[ ] improve[ment]". (Tr. 531). In November 2011, Plaintiff reported complete relief from all pulmonary symptoms since beginning Ativan the month before. (Tr. 529, 530). The medication was so effective she discontinued use of her inhalers, canceled her appointment with a pulmonologist, and believed herself capable of performing all activities of daily living without impediment. (Tr. 529).

4

Plaintiff returned to the hospital in May 2012 with complaints of a cough. (Tr. 336). She was placed on steroids and told to continue use of her inhalers. (Tr. 337). An x-ray taken at this visit revealed "[n]o consolidation, atelectasis, or pleural fluid", indicating no abnormalities. (Tr. 341, 415). On June 6, 2012, Plaintiff underwent another PFT and her FEV1 was 1.98 liters, revealing only mild obstruction. (Tr. 345). Plaintiff was diagnosed with bronchitis in July 2012 and treated with antibiotics. (Tr. 508). By August 2012, she reported a severe, unproductive cough but on examination, her lungs were clear to auscultation bilaterally, with no wheezes, rhonchi, or rales. (Tr. 505).

In early September 2012, Plaintiff went to the hospital because she suspected she had pneumonia based on painful coughing and wheezing. (Tr. 561). It was reported she had wheezing and coarse rales but had no diminished breath sounds and was moving air well. (Tr. 561). Her chest x-ray was normal. (Tr. 561, 563, 565). After being given aerosol treatment, Plaintiff showed marked improvement and was discharged home. (Tr. 562). On September 24, 2012, Plaintiff completed a PFT where her FEV1 was 1.11 liters which indicated a "moderately severe obstructive ventilator defect". (Tr. 557).

A CT scan performed on October 8, 2012, showed no pleural effusion, a stable aeration pattern, and no significant progression in atelactic changes. (Tr. 564). On October 12, 2012, Plaintiff again visited the emergency room complaining of shortness of breath and a cough that had persisted for two months. (Tr. 559). Plaintiff reported having been treated for pneumonia only a week and half before but the painful cough was continuing. (Tr. 559). On examination, her lungs were clear with no rales or rhonchi; and a chest x-ray was normal. (Tr. 559, 631). She was given an antibiotic and discharged home with a diagnosis of upper respiratory infection. (Tr. 558). A few days later, Plaintiff consulted Robert Hines, M.D., for her shortness of breath. (Tr.

5

677). He reported Plaintiff had smoked one to two packs of cigarettes a day for 25-30 years and continued to smoke despite being on the nicotine patch. (Tr. 677). He attributed her shortness of breath to COPD and emphysema, and prescribed her inhalers. (Tr. 678).

In March 2013, Plaintiff came to the hospital with complaints of difficulty breathing; her examination revealed no rales or rhonchi, she was discharged and told to follow-up with her family doctor. (Tr. 600-01). A chest x-ray performed at the time was unremarkable. (Tr. 629). In April 2013, Plaintiff reported to the emergency room with difficulty breathing and nonproductive cough. (Tr. 597). On examination, she had "scattered rhonchi" and a "rare wheeze" but the doctor suspected pneumonia; she was started on steroids and antibiotics and discharged home in stable condition. (Tr. 598). An x-ray on April 8, 2013 showed some consolidation in her lungs which was likely pneumonia but another x-ray a week later revealed "no focal pulmonary consolidation" and was negative for pneumonia. (Tr. 627, 628).

An x-ray taken on July 2, 2013, showed some new infiltrate to the lungs but no pleural effusion. (Tr. 699). Her visit to the hospital at this time was precipitated by shortness of breath; her examination revealed bilateral wheezing, rales, and rhonchi. (Tr. 702). She was discharged with a diagnosis of bronchitis and exacerbation of COPD. (Tr. 712-13). However, by July 22, 2013, her x-ray was clear of infiltrate, pleural effusion, and vascular congestion. (Tr. 696).

On September 12, 2013, a chest x-ray showed clear lungs and no vessel congestion. (Tr. 694). Plaintiff continued to complain of shortness of breath, chest pain, and cough on September 19, 2013. (Tr. 760). The doctor noted basilar rales, expiratory wheezes, and diminished breath sounds; he assessed her with asthma. (Tr. 762-63). But in late September 2013, Plaintiff was admitted to the hospital for seven days due to exacerbation of COPD; an x-ray taken upon admission showed "patchy infiltrate" that may represent pneumonia. (Tr. 686, 693, 772). It was

6

noted she was mildly hypoxic and was to be evaluated for home oxygen as needed. (Tr. 686). A pulse oximetry test showed 90% saturation on room air; however, after only mild exercise her saturation dropped to 86%. (Tr. 690). An x-ray taken after she had been admitted for a few days showed no improvement, yet no worsening of her condition. (Tr. 691, 692). At a follow-up in early October 2013, Plaintiff had no wheezes, rales, or dyspnea but did have diminished breath sounds on auscultation. (Tr. 766-67).

*Consultative Examiner*

On July 10, 2012, Plaintiff saw Robert Dallara, Jr., Ph.D., for a psychological consultative examination. (Tr. 353). At this appointment, Plaintiff described her daily activities as waking up by 6:00 a.m., taking care of three grandchildren, watching TV, and doing household chores. (Tr. 354). She also reported doing "some cooking, [ ] cleaning, and some laundry depending on her breathing." (Tr. 354). Dr. Dallara's mental status examination was unremarkable although he noted some difficulties withstanding workplace stressors. (Tr. 353-57).

*State Agency Reviewers*

In July 2012, Leslie Rudy, Ph.D., opined Plaintiff had mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 76). Dr. Rudy noted Plaintiff managed the care of her grandchildren and the household, and had no history of psychiatric treatment. (Tr. 76). At the same time, Maria Congbalay, M.D., opined Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand, walk, or sit for six hours in an eight hour day, and had unlimited ability to push/pull. (Tr. 77-78). Additionally, she could frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch and crawl. (Tr. 78). Lastly, Dr. Congbalay opined

7

Plaintiff should avoid concentrated exposure to extreme heat and cold, humidity, fumes, odors, dust, gases, and poor ventilation. (Tr. 79).

On reconsideration in September 2012, Steve McKee, M.D., and Mel Zwissler, Ph.D., concurred with the opinions of the initial reviewers. (Tr. 100-02, 109-10).

*ALJ Decision*

In December 2013, the ALJ concluded Plaintiff had the severe impairments of COPD, bronchitis, asthma, and mild emphysema (collectively, pulmonary impairment); but these severe impairments did not meet or medically equal any listed impairment. (Tr. 15-19). The ALJ then found Plaintiff had the RFC to perform light work except that she could frequently stoop, kneel, crouch, crawl, climb ramps and stairs, and may occasionally climb ladders, ropes, or scaffolds. She also needed to avoid concentrated exposure to humidity, extremes of heat and cold, fumes, odors, dust, gases, and poor ventilation. (Tr. 19).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could perform her past relevant work as cashier; or in the alternative, as a wire worker, electronics worker, or assembly press operator. (Tr. 22-24).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings

"as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work

9

in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) she improperly concluded Plaintiff did not meet Listings 3.02, 3.03, and 3.07; and (2) the RFC determination lacked a basis in substantial evidence. (Doc. 11, at 3). The Court will address each argument in turn.

*Listings*

A claimant bears the burden of showing she meets or equals a listing impairment. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999). If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d). In order to determine whether a claimant's impairment meets or is medically equivalent to a listing, the ALJ may consider all evidence in a claimant's record. §§ 404.1520(a)(3), 404.1526(c). In reviewing an ALJ's listing determination, there is no requirement for "heightened articulation" by the ALJ, as long as the finding is supported by substantial evidence. *Bledsoe v. Barnhart*, 165 F.App'x 408, 411 (6th Cir. 2006) (citing *Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1986) (an ALJ's step-three determination is not to be overturned unless it is legally insufficient)).

*Listing 3.02(A) Chronic Obstructive Pulmonary Disease*

In her first assignment of error, Plaintiff asserts the ALJ erred by not finding her disabled pursuant to Listing 3.02(A) because she had one FEV1 result that met the listing requirements;

and thus, it was error to consider other FEV1 values in the record. (Doc. 11, at 10-12). Listing 3.02(A) speaks directly to the requirements of finding disability based on COPD. Specifically, a claimant must have an FEV1 equal to or less than the values specified, depending on the claimant's height, to meet the listing. 20 C.F.R. Pt. 404, Subpart P, App. 1, § 3.02(A), Table I. For claimants between 61-63 inches, like Plaintiff, the FEV1 must be equal to or less than 1.15. *Id.*

However, in addition to FEV1 values, courts and ALJs must consider testing administration procedures. For instance, three satisfactory forced maneuvers must be taken during each PFT, and the highest FEV1 value of the three testing maneuvers prevails as the determinant score. *Id.* § 3.00E. In addition, a PFT should be repeated after administration of an aerosolized bronchodilator, if the pre-bronchodilator FEV1 value is less than 70 percent of the predicted normal value. *Id.* Moreover, lung function testing should "not be performed unless the clinical status is stable (e.g., the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness)." *Id.* Finally, review of the "longitudinal clinical record" including "a description of the treatment prescribed by the treating source" is required. *Id.*

In this instance there are three separate PFTs: March 24, 2011, with an FEV1 of 1.31 liters; June 6, 2012, with an FEV1 of 1.98 liters; and September 24, 2012, with an FEV1 of 1.11 liters. (Tr. 303, 345, 580). The documentation provided does not substantiate that the tests performed on March 24, 2011, and September 24, 2012, met the required administrative procedures laid out above. (*See* Tr. 303, 580 *compared to* Tr. 345-50). There is no evidence that the testing was re-administered after the administration of a bronchodilator or that they were done in a period of clinical stability. In fact, the March 24, 2011, PFT was performed while

11

Plaintiff was hospitalized and the September 24, 2012, PFT occurred during a period where she complained of pneumonia. (*See* Tr. 267-313, 559, 561). Thus, the FEV1 values produced from these two tests are not entirely reliable; despite this, they are still reviewed alongside other evidence in the longitudinal medical record to determine whether a plaintiff meets the listing. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 3.00E; § 404.1520(a)(3).

Here, the ALJ noted one FEV1 value that met the listing requirements, but also noted two others that were above the listing threshold. (Tr. 19). Throughout the remainder of the opinion, the ALJ cites to evidence which undermines the severity of Plaintiff's condition, including inconsistent medical records, activities of daily living, and testimony. (*See* Tr. 19-21, 38, 42, 228-34, 247, 250, 267, 270-72, 290-92, 277, 281-89, 301-02, 304-09, 529, 530, 561-62, 631). Importantly, an ALJ does not have to provide rationale or specifically identify evidence of claimant's failure to satisfy a listing. *Becker v. Comm'r of Soc. Sec.,* 2009 WL 483833, at *6 (S.D. Ohio) (citing *Gonzalez v. Sullivan,* 914 F.2d 1197, 1200, 1201 (9th Cir.1990)). The ALJ did not err by considering the three FEV1 values in totality or by reviewing the medical record in its entirety before determining Plaintiff did meet the listing; but simply, did not credit a single test result as indicative of Plaintiff's overall condition. Thus, the Court recommends finding the ALJ had substantial evidence, based on the longitudinal medical record, to find Plaintiff did not meet Listing 3.02(A).

*Listing 3.03(B) Asthma and Listing 3.07(B) Bronchiectasis*

Plaintiff also asserts she met the listing requirements for 3.03(B) and 3.07(B) because the ALJ incorrectly took into account only hospitalizations and not instances of "physician intervention". (Doc. 11, at 12-15). As a threshold matter, Listing 3.07(B) requires a diagnosis of bronchiectasis as *demonstrated by appropriate imaging techniques*. 20 C.F.R. Pt. 404, Subpart P,

12

App. 1, § 3.07. (emphasis added). Plaintiff provides no evidence that she was ever diagnosed with bronchiectasis and further, has provided no diagnostic images confirming the condition. Thus, the ALJ did not err by not considering or finding Plaintiff did not meet the requirements of this listing.

Listing 3.03(B) describes asthma attacks that "require[ ] physician intervention, occurring at least once every [two] months or at least six times a year." *Id.* §§ 3.03(B), 3.07(B). Attacks are defined "as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." *Id.* § 3.00C. Further, to meet the requirements of Listing 3.03 for asthma, the medical evidence should include "spirometric results obtained between attacks that document [ ] baseline airflow obstruction." *Id.*

In her brief, Plaintiff has conflated the requirements of Listings 3.03(B) and 3.07(B) by arguing that her episodes of bronchitis and pneumonia satisfy the requirements of Listing 3.03(B). (Doc. 11, at 13-15). This is simply not the case and Plaintiff has cited no evidence to prove the existence of chronic asthma attacks which would rise to the level of the listing. Even assuming Plaintiff's illnesses were characterized as asthma, the listing requires that the treatment take place in "a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 3.00C. Thus, the ALJ did not err by reviewing Plaintiff's hospitalizations and trips to the emergency room for treatment in a one-year period.

The Court recommends finding the ALJ did not commit error in concluding the Plaintiff did not meet her burden of proving she met the requirements of Listings 3.03(B) or 3.07(B).

*RFC*

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Plaintiff argues the ALJ's RFC is not supported by substantial evidence but rather only by cherry-picked negative evidence to the exclusion of the majority of favorable evidence. (Doc. 11, at 16-19).

In support of the RFC, the ALJ noted that the only opinions in the record relevant to functional limitations were those provided by the state agency reviewers. (Tr. 22). These uncontested opinions were given significant weight and are a reliable source upon which to base an RFC. *See* 20 C.F.R. § 404.1527(e)(2)(i); *Vorholt v. Comm'r of Soc. Sec.,* 409 F.App'x 883, 887 (holding an ALJ was justified in relying on the opinion of the state agency doctor). Furthermore, there is ample evidence in the record to support the conclusion that Plaintiff is capable of a restricted level of light work; particularly, her activities of daily living which show she is able to manage money, medications, chores, and childcare. (Tr. 21, 74, 228-34, 353-57). The medical record is also replete with instances of benign findings in both objective tests and upon examination. (Tr. 20, 270-72, 276, 277, 281, 282-84, 290-92, 317, 323-25, 341, 415, 505, 529-30, 559, 561-64, 600-01, 629, 631, 694, 696, 699). The ALJ did not note all of these

instances in her opinion; however, she is not required to. Far from resulting in reversible error, an ALJ's citation to representative facts in the record is necessary to support her decision. *See White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 285 (6th Cir. 2009) ("The problem with White's cherry picking argument, however, is that it cuts both way. She too cherry picks data.").

In reviewing the totality of the record, taking into account medical records, medical opinions, activities of daily living, and testimony, the ALJ had substantial evidence to support her decision. Although contradictory evidence was cited by the Plaintiff, it does not make the ALJ's citations any less appropriate. The question on review is not whether substantial evidence could support another conclusion, but, rather, whether substantial evidence supports the conclusion reached by the ALJ. *Jones,* 336 F.3d at 477. In reviewing the opinion of the ALJ, the Court recommends finding substantial evidence supported the ALJ's RFC determination.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.

       s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).